UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

BRIAN MEJIA,                                               24 CR 212 (VSB)

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**DEFENDANT BRIAN MEJIA'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO EXCLUDE AND SUPPRESS
IDENTIFICATION EVIDENCE**

VLADECK RASKIN & CLARK, P.C.
Susan J. Walsh
Marissa Balonon-Rosen
111 Broadway, 15th Floor
New York, New York 10006
212-403-7300
*Attorneys for Brian Mejia*

January 8, 2025

#42046

# TABLE OF CONTENTS

Preliminary Statement.................................................................................1

Introduction...............................................................................................3

Statement of Pertinent Facts.......................................................................7

March 1, 2024 Identification .......................................................................7

March 2, 2024 Identification .......................................................................10

I.    THE PROPOSED IDENTIFICATION EVIDENCE IS
      INADMISSIBLE LAY OPINION ........................................................13

      A.  The Witnesses' Idenfications Are Not Based on First-Hand
          Knowledge or Observation..............................................................14

      B.  These Witnesses' Idenfications are Not Helpful ...........................18

      C.  The Identifications Are Improper if Based on Specialized
          Knowledge ......................................................................................20

II.   THE PROBATIVE VALUE OF THE IDENTIFICATION EVIDENCE
      IS OUTWEIGNED BY THE RISK OF UNFAIR PREJUDICE AND
      ADMISSION OF THE TESTIMONY BY LAW ENFORCEMENT
      RAISES SUBSTANTIAL RISKS OF UNCONSTITUTIONALLY
      CURTAILING CONFRONTATON AND CROSSEXAMINATION, U.S.
      CONST. AMEND. VI...........................................................................21

III.  THE PROFFERED EVIDENCE RESLTED FROM UNDULY
      SUGGESTIVE IDENTIFICATION PROCEDURES AND IS
      UNRELIABLE .....................................................................................23

CONCLUSION .............................................................................................27

**Preliminary Statement**

Defendant Brian Mejia respectfully moves pursuant to Federal Rule of Criminal Procedure 12 (b) (3)(C), Federal Rules of Evidence 701, 403 and 404(b) and the Fifth Amendment to the United States Constitution to exclude and Suppress the Government's proposed identification evidence and to preclude any identification by the Government's witnesses at trial or, in the alternative, for a pretrial hearing pursuant to *United States v. Wad*e, 388 U.S. 218 (1967), regarding the admissibility of this proposed evidence.

To date, the Government has identified only two law enforcement officers who purport to have identified Mr. Mejia from two separate "Wanted" posters on March 1, 2024 and March 2, 2024, respectfully.  (*See* Exhibits A and B.)  It appears that both officers were engaged in the investigations in the Bronx and in all likelihood collaborated with other law enforcement officers in the Bronx in an attempt to identify and apprehend the shooters.[1]  One identifying Detective was unequivocally tasked with investigating the bodega shooting and clearly discussed Mejia as a suspect before purportedly "identifying" him.[2]  From the discovery provided to date, the extent of either law enforcement officer's personal interaction or exposure to Mr. Mejia, if any, prior to signing the attached "Wanted" posters appears to be *de minimus* in recent years. Although the Government's production reflects that one of the "identifying" officers, PO Reynoso, responded to a 911 call in the 48th Precinct where Mr. Mejia was wounded and within minutes was removed, treated and transported to the hospital days earlier (*See* Exhibit C), that was her only interaction with him - ever.   The second "identifying witness," Detective Gidarisingh, was not only one of

---

[1]  In fact, Mr. Mejia was himself the victim of a shooting in the 48th Precinct in the Bronx on February 28th.

[2]  Recent Government disclosures indicate that not only did Det. Gidarisingh confer with other officers before identifying Mejia on the Wanted poster, it appears he viewed and manipulated the surveillance video, "slowed it down and watched different angles," among other things.

the Detectives involved in the arrest of Mr. Mejia and the search of his apartment weeks after the events that led to Mejia's arrest, Gidarisingh also appears to have led the very investigation into the bodega shooting that led to this prosecution.  Government notes suggest that while Det. Gidarisingh claims to have had previous interactions with Mejia, it is also apparent he conferred with multiple members of law enforcement across multiple precincts before "identifying" Mejia in Exhibit B.

While it is obvious and probably normal investigative practice that law enforcement conferred internally and across precincts and agencies to investigate these crimes, relying on those intimately involved in that pursuit as "identifying witnesses" is fraught with risk of impermissible suggestivity.  Certainly, there is nothing in the proffered discovery to suggest that any procedural safeguards or processes were followed to effectuate the two "identifications" and avoid suggestivity and ultimately unfair taint marring their reliability.  In short, there is substantial risk that the identifications are constitutionally infirm if only due to how the investigations unfolded. The Government now seeks to introduce these two flawed "identifications" and to have these witnesses repeat these improper "identifications" at trial.  The Government, which bears the burden of establishing admissibility of these identifications, cannot do so.

First, these identifications are lay opinions that fail to satisfy the requirement of Rule 701. Neither of these opinions is the product of first-hand perception; rather, both are the result of after-the-fact observations.   In addition, these identifications would not be helpful because the jury will be in as good a position as the proposed witnesses to review the surveillance footage without distraction at trial, observe Mr. Mejia and determine if he is depicted in the video.     Moreover, any identification from Officer Reynoso or Detective Gidarisingh is improper to the extent it is

premised in any part on his or her training or experience – specialized knowledge not possessed by an average juror.

Second, this evidence is inadmissible under Rules 403 and 404(b) because, in addition to being unhelpful, it would waste the jury's time to hear from witnesses whose identifications are based on these same surveillance footage the jury will likely see.   The imprimatur of these law enforcement officers (whose knowledge of Mr. Mejia may arise out of his prior interactions with the criminal justice system) providing their opinion as to an ultimate question of fact also presents a substantial risk of unfair prejudice and misleading the jury.

Even in the electronic folders produced as Rule 16 where the signed "Wanted" posters were produced and the recently proffered interview notes of both officers, there are prejudicial and structural errors that likely resulted in identifications (and their anticipated reprise at trial) to be excluded as a matter of law.   To the extent the Court does not exclude these identifications, it should hold a pretrial hearing to ensure that such identifications are admissible under the Fifth Amendment – i.e. that they did not result from unduly suggestive procedures and are unreliable.

## **Introduction**

On February 28, 2024, following the shooting of an apartment door on Creston Avenue in the Bronx, surveillance video was recovered from the building and surrounding neighborhood. Apparently, footage was captured from 131 E 183rd Street which purportedly shows a person walking, clothed from head to toe in black, wearing a mask which is momentarily and partially pulled down, sometime following the incident.   It appears that NYPD's 46th Precinct captures a screenshot of that person walking on surveillance video and puts it on an "Information Wanted"

flyer    describing    the    event    and    disseminated.    (See,    Exhibit    A.)





The 46 Detective Squad is attempting to identify the above pictured individual in regards to a shots fired that occurred inside 2333 Creston Avenue apartment 3B. The Above pictured individual did discharge firearm multiple times into the apartment door causing public alarm, fear and annoyance. Any information about the above pictured individual contact the 46 Detective Squad above subject , please notify  Det. BRENDAN MCMORROW OR Detective Borough Bronx at

Investigator: Det. BRENDAN MCMORROW
Command Assigned: 269-46 DET SQUAD
Case# 2024-770 Complaint Report# 2024-046-02119

4

On February 29, 2024, following a shooting of a man in the legs inside a bodega on Westchester Avenue, again police collect surveillance video footage from the area, including from inside the bodega. This time law enforcement from the NYPD's 40th Precinct appear to take two screenshots from surveillance inside the store and outside the store, showing the shooting suspect dressed from head to toe in all black with his or her face almost entirely obscured by a mask that covers their mouth, a hood that covers their head and depicting only a blurry photo of eyes and part of their nose.  Law enforcement placed the two images side by side on a Wanted flyer.  (*See* Exhibit B.)



**POLICE DEPARTMENT** | **DETECTIVE BUREAU** | **POLICE DEPARTMENT**
CITY OF NEW YORK | Wanted Flyer # 90580829 | CITY OF NEW YORK



# WANTED
# FOR MALE SHOT



*I, Det. Gridarisingh recognize the depicted individual as Brian Mejia.*
*DOB:* ▮▮▮▮▮

*3/2/24 1530*

**THE 40 PRECINCT DETECTIVE SQUAD IS ENDEAVORING TO IDENTIFY THE PICTURED MALE IN REGARD TO A NON-FATAL SHOOTING THAT OCCURRED ON FEBRUARY 29, 2024 AT APPROXIMATELY 1927 HOURS INSIDE OF 656 WESTCHESTER AVENUE BRONX COUNTY IN THE CONFINES OF THE 40 PRECINCT**

Anyone with information regarding the above subject , please notify  Det. JAVIER CORDERO  at ▮▮▮▮
OR Detective Borough Bronx at ▮▮▮▮

**Investigator:**  Det. RUBEN SERRANO
**Command Assigned:** 263-40 DET SQUAD
**Case#**  2024-954  **Complaint Report#**  2024-040-02713

6

According to the heavily redacted NYPD documents provided in Rule 16 materials, sometime after or during a law enforcement "conferral" which took place on March 1, 2024 between at least Police Officer (PO) Reynoso and Det. McElhinney, PO Reynoso writes their name on the first flyer, circles the image and writes the words, "Brian Mejia."  (*See* Exhibit A.) The following day, March 2, 2024, also after or during a "conferral" between law enforcement, Det. Gidarisingh writes his name on the wanted flyer that shows the two photos. (*See* Exhibit B.)

The pre-trial discovery materials provided to date, while heavily redacted, indicate that the lead Detectives assigned to these investigations, among other law enforcement, clearly confer concerning their investigations, their suspicions and their suspects on multiple occasions before any purported "identification proceeding" is conducted by the two law enforcement officers. Setting aside how anyone could credibly identify with any degree of certainty the images depicted in these two Wanted posters, (Exhibits A and B), Mr. Mejia now moves to exclude the Government's identification evidence, precluding any in-court identifications, suppression of the Government's identification evidence or, alternatively, for a hearing at which the Court can determine whether those identifications are sufficiently reliable and free of suggestive taint to be admitted at a fair trial.

**Statement of Pertinent Facts**

**March 1, 2024 Identification**

Following the February 29, 2024 Creston Avenue apartment door shooting, the investigation apparently led by Detective Parris of the 46th Precinct, according to the heavily redacted Rule 16 materials, the first identification of Brian Mejia took place when PO Reynoso or someone on PO Reynoso's behalf wrote their name on an "Information Needed" flyer. Under the handwritten "PO Reynoso" is a Tax ID number along with the date and time of "3/1/24 00:28hrs."

The words "Brian Mejia" were written to the left of the circled man. The flyer lacks any statement, signature, or affirmation by PO Reynoso, or any other law enforcement person, but does contain a description of the event. (Exhibit A).

The Rule 16 materials appear to reflect only two references to PO Reynoso's identification of Brian Mejia. The first is in the DD5 of Det. Andrew Macelhinny (of the 46th Precinct), Follow-Up No 23, when he writes that the Wanted Flyer/ Information Needed Flyer was signed by PO Reynoso around 00:28am[3].:

---

**Details**

**Summary of Investigation:**
1. On March 1, 2024, at approximately 1147 hours, I have attached the Wanted Flyer/Information Needed Flyer signed by P.O. Reynoso, Shield# 23028, Tax# ███████ 048 Pct, on March 1, 2024, at approximately 0028 hours with Det. Madden to this document.


2. For your information.

---

(*See* Exhibit D.) The only other mention of PO Reynoso's "identification" of Brian Mejia in discovery is in Det. McMorrow's DD5 dated March 25, 2024, which is weeks after the purported identification occurred. (*See* Exhibit E.) Det. McMorrow wrote that he obtained a wanted flyer and had Det. Madden assist in a conferral with Det. Reynoso around 11:47am. *Id.*

---

2.All Video below collected between 02/28/24 and 02/29/2024
Video collected from 2333 Creston (incident location) Video collected from Det Burgos rom ███████
████████████████ Video collected is accurate to date and time, results are as follows:-Camera 01,03,
04: At approximately 0827 hours video shows suspect exiting 2333 Creson Avenue traveling N/B on Creston Avenue on foot.
Suspect is wearing black hoodie, black vest, black pants, black hat and black sneakers. Video shows suspect returning to 2333
Creston Avenue at approximately 0829 hours, opening the front door to the building what appears to be a key then walking up the
stairs wearing the same clothing described. At approximately 0907 hours video shows suspect exiting 2333 Creston Avenue and
fleeing of foot S/B on Creston Avenue. After extensive video canvas US did obtain a photo for a wanted flyer and did have Det
Madden assist in a conferral with Po Reynoso Tax# ██████ 48 Patrol on 03,01,2024 at approximately 1147 Hours.

---

The Government has not provided (nor does it appear that law enforcement memorialized) any information concerning the content other than the fact of "conferral" among law enforcement

---

[3] Unfortunately, the Rule 16 materials are not individually Bates stamped.

at the time they are obviously circulating Wanted Posters.  Indeed, the Rule 16 materials provided, indicate that there are multiple instances of collaboration among the 40th, the 48th, and the 46th precincts among other law enforcement agencies before any identifications are made. Much of the content of those conferrals is lacking save a few instances.   On February 29th at 20:40, <u>before any identification proceedings are conducted</u>, Detective Gidarisingh of the 40th precinct memorializes another "conferral" between the 40th and 48th Precincts referencing the "non-fatal shooting" of Brian Mejia who here is referenced by name. (*See* Exhibit F.) Clearly, there is discussion about Mr. Mejia among law enforcement, and multiple conferrals including what appears to be monitoring of what law enforcement believe is Mejia's Instagram account.

It appears that PO Reynoso was one of several officers who responded to the location where Mr. Mejia was shot, her own bodycam recording reflects that her exposure to the wounded young man is under four minutes long while he is being administered first aid and ultimately removed to the hospital on a stretcher within minutes.  He is supine or half supine throughout.   The bodycam shows the officer questioning a houseful of other witnesses in the frenetic and chaotic aftermath of Mejia's injury which included a barking dog and multiple civilians and law enforcement officers in and out of the apartment.   Mostly, her role appears to have been to safeguard the scene, voucher property evidence and handwrite a draft "scratch copy" of the assault complaint when Mejia is rushed away within minutes on a stretcher and transported to the hospital.  Notably, Reynoso is not the officer who interviews Mejia about the assault later at the hospital.    To be sure, there is no contemporaneous information recorded concerning why Reynoso believed the Wanted photo to be Brian Mejia. [4]  In Det. McMorrow's DD-5 (Exhibit F), he describes canvassing for video and

---

[4]  Multiple DD-5's apparently drafted by Detective Justin Parris of the 46th Precinct on March 1, 2024 indicates that he consulted with Detective Dononvan of the 48th Precinct and also reviewed body-camera footage of the assault on Mr. Mejia which occurred in the 48th Precinct.

watching video immediately before stating that Det Madden "conferred" with PO Reynoso, clearly suggesting that PO Reynoso was likely exposed to more information than just the Wanted flyer. According to Government notes proffered of a December 17, 2024 telephone interview with PO Reynoso nine months after the event, this single, emergency aided call which clearly involved divided attention in  with less than four minutes of interaction with Mr. Mejia present, is her only interaction with Mr. Mejia - ever.  According to PO Reynoso, she knew nothing of the underlying crime or investigations when a Detective from the 46th Precinct "asked her to come to the 46 precinct to see if she could identify an individual" and "when arrived, was shown the wanted flyer" and purportedly recognized the person as Brian Mejia. (USAO-000200)

What is clear is that PO Reynoso is provided a single photo of a man who is covered from head to toe in black clothing, with his face, head and body almost entirely obscured.     No information disclosed provides any contemporaneous description of what took place during the "conferral" or what if any safeguards whatsoever were maintained to ensure the integrity of this purported identification.

### March 2, 2024 Identification

The second purported identification is also made by a law enforcement officer;  Det. Gidarisingh of the 40th Precinct, (the same detective assigned to investigate the bodega shooting at 656 Westchester Avenue that occurred on February 29, 2024).  It is Detective Gidarisingh, who two days later signed the flyer on March 2, 2024 at 3:30pm that displayed two images of a man wearing all black from head to toe, including a mask and with the partially blurry face almost entirely obscured.    Here, Det. Gidarisingh attests "I, Det. Gidarisingh, #███ recognize the depicted individual as Brian Mejia." (*See* Exhibit B.) Det. Gidarisingh's notes state that he was conducting a "conferral" with yet another member of law enforcement and here clearly, the two of

them "discussed details to the ongoing investigation of recent shootings in the confines of the 40, 48, and 46" ahead of Det. Gidarisingh making an identification. (*See* Exhibit G.)   What "details were discussed" is entirely omitted from the report, although specific notation of the entirely "black" outwear is recorded.

Information concerning what if any professional procedures or constitutional safeguards were employed by any of these law enforcement to prevent undue suggestivity, purposeful or otherwise, is absent from the Rule 16 materials disclosed.  What is apparent is that law enforcement obviously "conferred" and shared information in their efforts to resolve the crimes.  And, what is equally apparent is that Det. Gidarisingh quite obviously focused on clothing and outerwear recorded in the reports, and not a physical description of a person. (See Exhibit G. )("The perpetrator is wearing *the same* Moncler black vest and Asics black sneakers with a matching all black outfit.")(emphasis supplied)("sneakers match the sneakers from social media posts"). (*See also* Exhibit H.)

While PO Reynoso, had fleeting and *de minimus* exposure to a wounded Mejia in a chaotic scene after he was the victim of a shooting in the 48th Precinct and from which he was transferred to the hospital, Det. Gidarisingh, in notes of his December 14, 2024 phone interview with the Government claims to have interacted with Mr. Mejia "at least a dozen of times"  His first interaction he purports, was in or around 2015.   Of course, Brian Mejia was barely 15 years old in summer 2015 – nine years ago.  The duration, frequency much less the recency of any these purported interactions are lacking in the Government's notes, except to note that Mejia "hangs out" in the precinct area "all the time" where Gidarisingh is apparently the "neighborhood coordination officer."   Notably, according to the Government's notes, Gidarisingh remarks that despite purportedly looking "closely at video; slowed it down and watched different angles" of the bodega

shooting it was not until March 2, 2024 *after he learned that Mejia* "actually had not stayed in the hospital long and had been out at the time of the shooting" that he "signed the wanted flyer." Apparently, Gidarisingh believed Mejia to be in the hospital at the time of the bodega shooting and accordingly, did not identify him as the shooter in the video right away. (USAO_000199) That sequence of events alone is rife with suggestivity.

Of course, to the extent the Government suggests this identification is confirmatory, obviously the Court should note that Gidarisingh's purported "dozens" of face-to-face interactions with Mejia could hardly have been in his recent, adult years given that Brian Mejia has spent the better part of the last four years before his arrest in this case in custody. See, Sworn Complaint of Det Tepperman at page 7, ¶ 11, Det. Tepperman ("Based on my review of criminal history records, I know that … BRIAN MEJIA . . . was sentenced on or about January 27, 2020 to six months' imprisonment…. [O]n or about September 28, 2021, MEJIA was convicted in this District….[and] on or about December 13, 2021 …was sentenced to 18 months' imprisonment….[and] [a]fter completing his term ..was resentenced . . . to an additional 12 months' imprisonment [and] was released . . . on December 29, 2023, about two months before the shooting incidents described….").

In its reply brief challenging the lawfulness of the apartment search that Detective Gidarisingh participated in, the Government acknowledges only that, "[m]embers of federal law enforcement were familiar with the defendant." Yet the essence of the Government's description is of purportedly matching clothing. No height, weight, race, stature, gender, skin color and for obvious reasons – no facial features are provided – instead the focus is only their suspect's attire. ("During each shooting, the defendant wore the same clothing: a black hooded sweatshirt and

mask, a black "puffer" vest, and black-and-silver sneakers. Social media showed that the defendant wore that clothing around the time of the shootings." Gov't Dec 5, 2024, Opp at 3.)

## I.    THE PROPOSED IDENTIFICATION EVIDENCE IS INADMISSIBLE LAY OPINION

The identification evidence the Government intends to offer at trial is inadmissible as a threshold matter because the witnesses' prior identifications and potential in-court identifications are lay opinions that do not satisfy the requirements of Rule 701. "[T]he use of lay opinion identification by policemen or parole officers is not to be encouraged," and, in the limited circumstances in which it is permissible, such evidence must satisfy the requirements of Rule 701. *United States v. La Pierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (noting that lay opinion identification evidence "is of dubious value") *vacated and remanded by United States v. LaPierre*, 52 F.3d 335 (9th Cir. 1995)(admission of lay opinion harmless error in light of overwhelming evidence of guilt). Lay witnesses may only provide opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Even in those limited circumstances where a Court has permitted law enforcement lay opinion evidence under distinguishable and narrow circumstances, the Court has reiterated the elements of Fed. R. Evid 701, and the innate inherent risk of prejudice in permitting it. *See United States v. Walker*, 974 F.3d 193 (2d. Cir. 2020)(collecting cases noting the danger and inherent prejudice in admitting such evidence). The Government, as the proponent of this lay opinion evidence, bears the burden of establishing that both (or any) proposed identification satisfies these standards. *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005). Here, it cannot carry this burden.

13

## A.    The Witnesses' Identifications Are Not Based on First-Hand Knowledge or Observation

As an initial matter, the witnesses' March 2024 identifications from Wanted Posters and anticipated in-court identifications of Mr. Mejia from either a Single Photo Identification (or even for the purposes of this argument from surveillance footage), are inadmissible lay opinions because they are not based on first-hand knowledge.   Neither of the proposed witnesses were present for either underlying event charged in the indictment nor watched it occur contemporaneously.   Their only "observations" of either incident are based on single photos or surveillance footage – both after the fact.   In such circumstances, their opinions about whether the photo or footage depicts Mr. Mejia fail the first requirement of Rule 701.   *See United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) ("Rule 701(a) requires that lay opinion testimony be *both* (a) based on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions.")).[5]

While the Government notes that Detective Jared Tepperman and other members of the Violent Gang Task Force observed Instagram photos, they concede that they are looking at clothing and shoes while the individual's face is almost entirely covered. *Id.*[6]   (*See* Exhibits A & B). *See also United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (explaining that "[a] rational perception is one involving 'first-hand knowledge or observation'") (quoting *United States v. Rea*,

---

[5]   *Cf. Garcia*, 413 F.3d at 213 (agent's lay opinion testimony that was "not limit[ed] …to his own personal perceptions" was inadmissible under Rule 701(a)); *United States v. Arroyo*, 600 F. App'x 11, 15 (2d Cir. 2015) (summary order) (lay identification opinion was admissible where it was based on witnesses' observation of defendant via security system "*at the time of the crime* from a safe distance" and witness first identified defendant "only seven hours" after the witness observed the event at issue) (emphasis supplied).

[6]   Detective Jared Tepperman is not one of the identifying witnesses although apparently, he was present for both telephone interviews of the identifying officers in December 2024. (USAO_199-200).

958 F.2d 1206, 1215 (2d Cir. 1992)). As the *Walker* court reiterated, "[w]here the jury is 'in as good a position as the witness to draw the inference' to which the opinion relates, the opinion is not helpful and should not be admitted." *Walker*, 974 F.3d at 205 (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)). "On the other hand, where an opinion is the result of factors not otherwise possessed by or communicated to the jury, lay opinion testimony is likely to be helpful." *See id.*

Lay opinion identification evidence, when it is permissible, must be offered by a witness who "**has had substantial and sustained contact with the person** [being identified]," such that "there is reason to believe that the witness is more likely to identify correctly the person than is the jury." *LaPierre*, 998 F.2d at 1465 (emphasis added); *see United States v. Fulton*, 837 F.3d 281, 296-99 (3d Cir. 2016) *see also, United States v. Kelly*, 2024 WL 182409 (S.D.N.Y. 2024)(admitting identification testimony of arresting officer who had *inter alia* at least 25 minutes of unobscured, direct interaction with defendant and was entirely insulated from purpose of identification procedure during subsequent investigation, particularly in the absence of other identification evidence). Obviously, PO Reynoso's 3 ½ minutes of chaotic contact with Mejia cannot be characterized as "substantial and sustained contact" with Mr. Mejia, and the same is true of the stale and vague interactions, if any, with Det. Gidarisingh. Within a few minutes of being sworn any jury will have a better and relevant familiarity with Mr. Mejia's adult face and body than either of these officers. Although PO Reynoso was apparently present when Mr. Mejia was removed from an apartment by ambulance after suffering a gunshot wound in a frenetic emergency encounter, she did not interview him there or at the hospital thereafter. There is no indication that the minutes-long emergency encounter captured on her body-cam, which the Government's notes suggest was her only encounter with Mejia, was anything close to "substantial and sustained"

within the meaning of the case law.   As for Detective Gidarisingh, the only interaction described with any detail in the notes memorializing his interview with the Government in December 2024, was with an adolescent fifteen-year old close to nine years ago in 2015.  No matter how Gidarisingh characterizes it, the purported "dozen" or so interactions also could hardly be substantial or sustained, given Mejia's absence from the community the most recent four years preceding these allegations.

To be sure, this Circuit has permitted the introduction of law enforcement lay opinion testimony based on surveillance footage, but it has done so under distinguishable circumstances. First, in *Walker*, the Second Circuit was careful to note the "thorny" issue of injecting the potential for overwhelming prejudice by permitting it.  *Walker*, 974 F.3d at 205. In that case, the probation officer who testified to lay opinion identification evidence had supervised the defendant for one year and spent "many hours" with the defendant in an obviously one-on-one controlled office setting while he reported and who had apparently changed his appearance substantially between the charged crime and trial. *Id*.   Here, at most PO Reynoso observed Mejia for under 4 minutes, while he was writhing and audibly crying out in pain while being attended to by EMS.  Unlike the witness in *Walker*, PO Reynoso never observed Mejia in the upright position, much less his gait or affect.  *Id*.  She had only fleeting contact with him under chaotic and pressing conditions.   Since the witness in *Walker* had far more exposure to the defendant in that case than PO Reynoso appears to have had here and because the witness in *Walker* had access to "factors not otherwise possess by or communicated to the jury," the Court found that lay opinion likely to be helpful.  *Id*. Obviously, the same cannot be said here.

Detective Gidarisingh's purported interactions are also distinguishable from those in *Walker*.   Setting aside that they are likely quite remote in time to the events charged and likely

stale if "sustained and substantial," none of them involved an arrest of Mejia, or appear to be more than fleeting, neighborhood encounters at most. In fact, the Detective admits he is not even aware of Mejia's place of residence, if any, in the "sector" he polices and where he claims to have had dozens of interactions.

The *Walker* Court also took careful note that because of how "fraught" the use of law enforcement identification witnesses is at trial, there the trial court carefully crafted limitations to avoid revealing the probation officer's identity to the jury to avoid obvious prejudice. *Id*. But, that type of limitation is not possible with these police witnesses given that they are integral to the investigation and the charges themselves. Hiding their identities as law enforcement here would unconstitutionally cabin the cross-examination and confrontation of these officers to such an extent as to violate the Defendant's Sixth Amendment Rights, as much as his Fifth Amendment Right to a fair trial. Sanitizing either identifying witnesses' profession – a NYPD officer and a Detective – essentially eviscerates the ability to probe their bias and influence (whether intentional or institutional) on cross-examination at trial. These law enforcement roles, and indeed their very roles in the investigation of the crimes charged in this indictment, especially as to Detective Gidarisingh's, must be challenged at trial. Detective Gidarisingh is not simply law enforcement who happened to make an identification two days after the event, he was tasked with investigating the crime, participated in the armed apprehension of Mejia from his bed in his home, searched it and seized evidence from the apartment. These officers' roles ferreting out crime and identifying suspects are far different than a probation officers' function which was more readily obscured from the jury in *Walker*. *Id*. To be sure, Detective Gidarisingh is on the body-camera footage related to Mejia's arrest and the search in this case and notably, is a part of the purported discovery of ammunition alleged to have "fallen" from the jacket/vest pocket at the moment the body-cameras

are turned off.  This ammunition provides the basis for Count Three.  (*See* Defense Motion to Suppress.)  Shielding Detective Gidarisingh's  identity as a law enforcement officer from the jury would prove impossible as to that Count in particular.  Curtailing the cross-examination would gut any meaningful exercise of Mejia's Sixth Amendment Rights.

Even assuming the two law enforcement officers viewed surveillance footage and not only the Wanted posters which almost entirely obscure the individual's face, the footage provided in discovery is blurred, staccato and without sound.  The physical appearance of the individual depicted on the videos and Mr. Mejia's physical appearance are what matters and each of which the jury will be able to observe at trial, slowly, carefully and in a well-lit courtroom, without distractions, focusing the relevant characteristics and not merely clothing.   This opportunity by a jury stands in marked contrast to almost any other law enforcement encounter with a civilian.  Passing interaction by law enforcement whether in the park or the precinct, distinguishes this matter from those in which "the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess" based on multiple, intimate or otherwise memorable interactions.  *United States v Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995).  The potential for prejudice is extreme.  See,  Section II (challenging evidence under Rules 403, 404(b) and 5th and 6th Amendments, *infra* at pp 21-23).

### B.    These Witnesses' Identifications Are Not Helpful

As noted above, the proposed witness identifications are also not helpful and are inadmissible under Rule 701 because the proffered testimony would "merely tell the jury what result to reach."   *Rea*, 958 F.2d at 1215.  A key question for the jury will be whether the Government has proven beyond a reasonable doubt that Mr. Mejia was the shooter depicted in the surveillance footage.  In making this determination, the jury will need to evaluate the totality

of the evidence, including closely scrutinizing the surveillance video upon which the Government will likely rely to prove the defendant possessed ammunition on the operative dates charged. Allowing the Government witnesses – particularly law enforcement witnesses – to provide their lay opinion as to this ultimate question of fact would effectively and improperly allow the Government to intrude upon the jury's role and direct a guilty verdict. *See Garcia*, 413 F.3d at 210-211 (noting that Rules 701, 702 and 704 are designed to ensure that opinion evidence does not "usurp the fact-finding function of the jury"); *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) ("Were [the Government's argument] to be accepted, there would be no need for the trial jury to review personally any evidence at all. The jurors could be 'helped' by a summary witness for the Government, who could not only tell them what was in the evidence but tell them what inferences to draw from it. That is not the point of lay opinion evidence.").

The proposed lay opinion identifications are also not "'helpful' within the meaning of Rule 701 because the jury will be in as good a position as the witnesse[es]" to draw the conclusion the witnesses would provide. *Rea*, 958 F.2d at 1216. Unlike the witness in *Walker*, PO Reynoso never even observed Mejia in the upright position during the less than 4 minute encounter, much less his gait or affect, in contrast to the yearlong relationship between the defendant and his probation officer in the *Walker* case. *Walker,* 974 F.3d 193. Reynoso had only fleeting contact with him under chaotic, pressing and emergency conditions where her attention is obviously divided. The same is true of any purported interaction with Det. Gidarisingh. Even assuming the interactions were close to a "dozen" as the Government notes proffer – none are alleged to have been prolonged, in depth or consequential but instead, appear only to be in passing by a neighborhood policeman. Since the witness in *Walker* had far more direct and sustained focused exposure to the defendant in that case than either identifying officer appears to have had

here and access to "factors not otherwise possess by or communicated to the jury," the *Walker* court found that lay opinion likely to be helpful.  *Id*.  Not so in this case.  Here, the jury here will be able to observe Mr. Mejia at length in a well-lit courtroom and compare his person to the person in the surveillance footage.    Importantly, each juror here will have their own individual ability to view the footage at trial, repeatedly, if necessary and to observe Mr. Mejia at trial and reach their own conclusion as to whether Mr. Mejia is depicted in the videos.  "[W]hen jurors can see with their own eyes both a defendant and a photograph that allegedly depicts that defendant, there is usually no need for a witness to testify to a resemblance between the two." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010).

### C.    The Identifications Are Improper if Based on Specialized Knowledge

While the Government has not produced detailed information regarding the identifications procedures themselves to date, it may argue that the law enforcement were able to identify Mr. Mejia from the photos due, at least in part, to their training and experience as police officers in the Bronx.  This attempt to bolster the helpfulness of either identification, however, underscores its inadmissibility because it relies on special training and experience that the average person does not possess.  The Second Circuit has held that "the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience." *Garcia*, 413 F.3d at 216; *see, e.g., United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (finding officers testimony improper under Rule 701 where officer "acquired his knowledge of how a fuel tank operates through his experience as a border agent inspecting vehicles").

Moreover, there is a substantial risk that the jury will improperly defer to the lay opinion of the law enforcement officers in light of their training and experience, further heightening the

scrutiny to which the proffered identification evidence should be subjected.  *See United States v. Freeman*, 730 F.3d 590, 599 (6th Cir. 2013) ("An agent presented to a jury with an aura of expertise and authority increases the risk that the jury will be swayed improperly by the agent's testimony, rather than rely on its own interpretation of the evidence."). Because the purported identifications of Mr. Mejia by Officer Reynoso and Detective Gardisingh are lay opinions that fail to satisfy the requirements of Federal Rule of Evidence 701, the Court should preclude evidence of these witnesses' prior and anticipated in-court identifications.

## II.    THE PROBATIVE VALUE OF THE IDENTIFICATION EVIDENCE IS OUTWEIGHED BY THE RISK OF UNFAIR PREJUDICE AND ADMISSION OF THE TESTIMONY BY LAW ENFORCEMENT RAISES SUBSTANTIAL RISKS OF UNCONSTITUTIONALLY CURTAILING CONFRONTATION AND CROSSEXAMINATION, U.S. CONST. AMEND. VI

The proffered identification evidence should also be excluded under Rules 403 and Rule 404(b) because any probative value of such evidence is substantially outweighed by the risk of unfair prejudice and misleading the jury.  *See* e.g. *Rea*, 858 F.2d at 1216.

Because the jury will be positioned as well as, if not better than the proffered witnesses to review the surveillance footage of the two underlying incidents in a courtroom without distraction and observe Mr. Mejia to ultimately determine if the person in the footage is Mr. Mejia, the proffered lay opinion identifications are not helpful and would be needlessly cumulative. *See Cameron*, 598 F.3d at 62.  As such the probative value of such evidence is practically none.   Moreover, in this case, unlike others where the record may have been  "devoid of other identification testimony" *Kelly, supra* 22024 WL 182409 at * 5 (*citing Walker* record "did not appear to contain other adequate identification testimony" ) in this case there is other identification evidence including at least one "CW-1" "who is familiar with Mejia" and apparently

upon whom the Government relied in the sworn complaint and arrest warrant in this matter.  See

Complaint at p. 5, paragraph 7 fn1. [7]

What is more, the imprimatur of law enforcement professionals (particularly Det.

Gardarisingh, who is so obviously tasked with investigating an underlying crime charged)

providing their opinion as to an ultimate question of fact presents a substantial risk of unfair

prejudice and misleading the jury.  *See United States v. Hampton*, 718 F.3d 978, 981(D.C. Cir.

2013); *Grinag*e, 390 F.3d at 750-51.  In addition, to the extent that either law enforcement officers

are permitted to share familiarity or prior interactions or observations of Mr. Mejia will

improperly suggest that Mr. Mejia is guilty of the offense charged because he engaged in prior

bad acts, other crimes, or misconduct accordingly had frequent interaction with law enforcement.

As this Court is well aware, such propensity evidence is prohibited.

Presumably, the law enforcement officers will testify that they or other law enforcement

they know "were familiar with the defendant" strongly and clearly implying that it is due to

Mejia's prior bad acts.  As most of the caselaw recognizes, "a danger of unfair prejudice may arise

when the source of identification testimony is a law enforcement official whose familiarity with

the defendant was obtained through the defendant's past exposure to the criminal justice system."

*United States v. Knowles*, 889 F.3d 1251, 1256-57 (11th Cir. 2018) (citation omitted).  In addition,

Reynoso's ability to recognize Mr. Mejia after a less than four-minute fleeting exposure to him as

the victim of a gunshot wound days earlier, unfairly and prejudicially attributes a motive for Mr.

Mejia implicating him in the subsequent crimes.  Det. Gidarisingh's purported familiarity with

---

[7] It may well be information from this or other CW's that the Government has redacted from the DD-5's and elsewhere that actually underlie the identifications by law enforcement here, but it is far from the case that the record here is "devoid" of other identification evidence – including multiple individuals present at the bodega shooting, including the victim.

Mr. Mejia "from the precinct" or his "having been brought in for questioning" unmistakably implies that Mejia is "a usual suspect" and implicates him quite directly.   There is hardly room for argument that the danger of unfair prejudice is particularly acute here. *See, Walker, supra*.

Finally, any ameliorating remedy such as the one used in *Walker* to disguise the identifying witness's roles or jobs will be inadequate in this trial.   In *Walker* the witness was a probation officer and the Court's decision upholding the lay opinion testimony was in large measure based on the fact that her job as such could be and in fact was screened from the jury.  *Walker*, 974 F.3d 193 (witness testified that individual was required to report to her).   Here, the witnesses are different.  Law enforcement in general and in this case, at least one specifically, is tasked with investigating the crime and finding the perpetrator.   Cross-examination of that personal and institutional bias may be instrumental in bringing before the jury why the identifications are tainted but at the same time will reinforce Mr. Mejia's prior interaction with law enforcement.   Removing the prejudice here will prove far more difficult than in the parole/probation officer context addressed in *Walker*.  Attempts to do so here would unconstitutionally cabin the cross-examination and confrontation of these officers to such an extent as to violate the Defendant's Sixth Amendment Right.   Sanitizing either identifying witnesses' profession – a NYPD officer and a Detective – essentially eviscerates the ability to probe their bias and influence (whether intentional or institutional) and veracity on cross-examination at trial.

### III.    THE PROFERRED EVIDENCE RESULTED FROM UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES AND IS UNRELIABLE

To the extent the Court does not exclude the identification evidence for the reasons stated above, it should suppress them as the unreliable product of unduly suggestive identification procedures or, in the alternative, hold a pretrial hearing to determine the admissibility of the two law enforcement witnesses' identifications.

As the Second Circuit has reiterated, mistaken eyewitness identifications play an outsized role in very many wrongful convictions.  *See United States v. Nolan*, 956 F.3d 71 (2d. Cir. 2020) ("eyewitness misidentification was present in an astonishing 71 percent of

the cases in which subsequent DNA testing established the factual innocence of wrongly convicted defendants. *See* Innocence Project, Eyewitness Identification Reform,

www.innocenceproject.org/eyewitnessidentification-reform (Last Visited Mar. 16,

2020")).  "[W]hen the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001); *see, e.g.,Manson v. Brathwaite*, 432 U.S. 98, 112-4 (1977). "Due process protects 'the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification.'" *United States v. Diaz*, 986 F.3d 202, 206–07 (2d Cir. 2021) (citing *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992)).

The Second Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one*." Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir 2005) (internal quotation omitted). *See United States v. Reed*, 2012 WL 2053758, (S.D.N.Y. June 6, 2012) (two, single-photo displays of the defendant shown to the eyewitness—a non-law enforcement witness-were impermissibly suggestive.); *United States v. Lumpkin*, 192 F.3d 280, 284, 288 (2d Cir.1999) (showing a single-photo of a suspect to two law enforcement officers following an undercover drug buy was impermissibly suggestive.); *United States v. Perez,* 2003 WL 721568, at *4 (S.D.N.Y. Feb. 28, 2003) (holding that single-photo array was impermissibly suggestive).

"A request for a *Wade* hearing is generally granted where any question is raised concerning the suggestibility of the identification procedure." *United States v. Chandler*, 164 F. Supp. 3d 368, 383 (E.D.N.Y. 2016) (quotations omitted) (collecting cases). And, the defense acknowledges that "[w]hile this Circuit has a preference for holding a *Wade* hearing upon a defendant's request, *see United States v. Archibald*, 734 F.2d 938, 941 (2d Cir. 1984), a defendant is not automatically entitled to a *Wade* hearing." *United Staes v Ikli*, 2017 WL 396681, at *3 (.S.D.N.Y. Jan. 26 2017). "The prudence of such a hearing has been emphasized by many decisions in the Courts of Appeals, most of which have in various ways admonished trial courts to use that procedure." *Watkins v. Sowders*, 449 U.S. 341, 345 (1981). *Wade* and its progeny apply to "all witnesses who offer in-court identification testimony," including "experienced, trained government agents." *United States v. Kahan*, 350 F. Supp. 784, 800 (S.D.N.Y. 1972), rev'd on other grounds 479 F.2d 290 (2d Cir. 1973). Because the "procedures" (to the extent any were followed based on the limited information disclosed) that led to the identifications made were highly prejudicial and unduly suggestive, and permeated by fundamental flaws such as a single-photo "Wanted" poster, repeated "conferrals" among witnesses, investigators and law enforcement– this Court should determine the admissibility of these identifications before they are offered or mentioned at trial.

Especially given that one photo is one where no part of the individual's face is exposed, (Exhibit B), it strains credulity that the officers did not speak with or to each other about their suspicions or "persons of interest" prior to the "identifications" having been made. The DD-5s disclosed in discovery document that there were ongoing conferrals across all three precincts. In fact, Detective Gidarisingh's December 2024 phone interview with the Government, acknowledges there was at least inadvertent suggestivity and taint introduced into his purported identification as he acknowledges identifying Mejia only after having "heard that Mejia actually

had not stayed in the hospital long and had been out at the time of the [bodega] shooting." Clearly, the detective's conclusion that it is Mejia on the video and/or poster is influenced by outside information and is hardly pristinely based on his own memory. The Second Circuit has made clear, "the utterance of suggestive comments before an identification is made" is inherently prejudicial. *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994). *See United States v. Al-Farekh*, 956 F.3d 99, 111-12 (2d Cir. 2020) (an identification procedure is unduly suggestive when a police officer provides a witness with previously unknown facts, such as identifying the suspect in a photo array); *see also United States v Nolan*, 956 F.3d 71, 81 (2d Cir. 2020) (describing how "the police employed highly irregular procedures in pursuing the witnesses' identification of [defendant], potentially biasing the victims' identifications by, for example, allowing them to talk among themselves about Nolan's identification" and noting that "[s]tudies have demonstrated that the memories of eyewitnesses are extremely susceptible to contamination by external information, a common source of which is cowitness interaction") (citation omitted).

These likely, (and even more likely inherently prejudicial) remarks to the "witnesses" irrevocably tainted and rendered unreliable any subsequent identifications. It is extremely unlikely that either of these two law enforcement officers had heard nothing about who colleagues suspected was the shooter before either made his/her identification, PO Reynoso's December 2024 recollection notwithstanding. While the discovery does not say precisely what was said, the clear implication is that law enforcement were conferring on who they suspected and why prior to either "identification." Surely, the Wanted posters were circulated and not kept secret. If either learned that his colleagues suspected Mr. Mejia was the shooter before viewing the Wanted Posters, this would render the identification procedures unduly suggestive and subsequent identification unreliable and inadmissible. Assuming both or either "witnesses" also viewed the surveillance

tapes, it is highly unlikely they did so alone with no colleagues around and made the "identifications" without discussing it with anyone.   The Supreme Court has held that witnesses' "identifications …[] in each other's presence [is] a procedure said to be fraught with dangers of suggestion*." Wade*, 388 U.S. at 234.

Even the limited information provided in the Government's disclosure as to how these "identifications" were handled, suggest that the "procedures" used to elicit these identifications were highly prejudicial and unduly suggestive.   The proffered identifications evidence should be suppressed on this record.   At a minimum, however, the Court should conduct a pre-trial hearing to evaluate the reliability of such evidence and to evaluate the danger of irreparable, unfair prejudice that putting such testimony before a jury absent pre-trial judicial probing of the witnesses outside the presence of the jury.

## CONCLUSION

For the foregoing reasons, the proposed identification evidence should be excluded or suppressed and excluded from the trial.   In the alternative, the Court should convene a pre-trial hearing regarding the admissibility of the proposed evidence.

Dated:  January 8, 2025
　　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　　　　Susan J. Walsh
　　　　　　　　　　　　　　　　　　　　　Marissa Balonon-Rosen
　　　　　　　　　　　　　　　　　　　　　Attorneys for Brian Mejia

Exhibit A





**POLICE DEPARTMENT | DETECTIVE BUREAU | POLICE DEPARTMENT**
**CITY OF NEW YORK | Wanted Flyer # 90543836 | CITY OF NEW YORK**

# INFORMATION NEEDED
# FOR RECKLESS
# ENDANGERMENT
# ( SHOTS FIRED)
## FIELD INFORMATION NEEDED - PERSON



Custom    Tag    2024-0

/ MALE

The 46 Detective Squad is attempting to identify the above pictured individual in regards to a shots fired that occurred inside 2333 Creston Avenue apartment 3B. The Above pictured individual did discharge firearm multiple times into the apartment door causing public alarm, fear and annoyance. Any information about the above pictured individual contain information able recognize above subject , please notify _Det. BRENDAN MCMORROW_ OR Detective Borough Bronx at _____

Investigator: Det. BRENDAN MCMORROW
Command Assigned: 269-46 DET SQUAD
Case# _2024-770_ Complaint Report# _2024-046-02119_

Exhibit B

 POLICE DEPARTMENT | DETECTIVE BUREAU | POLICE DEPARTMENT 
CITY OF NEW YORK | Wanted Flyer # 90580829 | CITY OF NEW YORK

# WANTED
## FOR MALE SHOT



*I, Det. Gidarisingh recognize the depicted individual as Brian Melis. DOB:*

*3/2/24  1530*

**THE 40 PRECINCT DETECTIVE SQUAD IS ENDEAVORING TO IDENTIFY THE PICTURED MALE IN REGARD TO A NON-FATAL SHOOTING THAT OCCURRED ON FEBRUARY 29, 2024 AT APPROXIMATELY 1927 HOURS INSIDE OF 656 WESTCHESTER AVENUE BRONX COUNTY IN THE CONFINES OF THE 40 PRECINCT**

Anyone with information regarding the above subject, please notify  Det. JAVIER CORDERO  at
OR Detective Borough Bronx at

**Investigator:** Det. RUBEN SERRANO
**Command Assigned:** 263-40 DET SQUAD
**Case#** 2024-954 **Complaint Report#** 2024-040-02713

31

Exhibit C

4/23/24, 3:37 PM                                    Complaint# 2024-048-001807

**Tracking# 91143678**

| CONFERRAL | | | | Crime/Condition<br>ASSAULT-FELONIOUS | Command<br>048-48TH PRECINCT<br>Date of This Report<br>02/28/2024 |
|---|---|---|---|---|---|
| **Date Reported**<br>02/28/2024 | **Complaint No.**<br>2024-048-01807 | **Date Case Assigned**<br>02/28/2024 | **Case No.**<br>2024 - 545 | **Unit Reporting**<br>SQUAD | **Follow-Up No.**<br>1 |

| Topic/Subject<br>(CONFERRAL) RESPONDING OFFICERS | Activity Date<br>02/28/2024 | Activity Time<br>00:30 |
|---|---|---|

**CONFERRED WITH**

**Details**

**Summary of Investigation:**
1. On February 28, 2024, at approximately 0030 hours, I interviewed P.O Amador ████ nd P.O Reynoso ████ nside 4646 Park Avenue in regard to the above listed case.

2. I was informed by P.O Amador that he was working along P.O Reynoso ████ assigned to the 48 Precinct sector B when they received a service call for a male shot at 4646 Park Avenue. Upon arrival Officers were met by the 911 caller and victim inside the apartment, they observed a male with a leg injury that was consistent with a gunshot wound. Victim did not appear to have life threatening injuries and was transported to Saint Barnabas Hospital by way of ambulance. P.O Amador states they did secure the scene.

**ATTACHMENTS**

| Reporting Officer: | Rank<br>DT3 | Name<br>CHAD POIDOMANI | | Tax Reg. No. | Command<br>271-48 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing | Date<br>Reviewed:<br>03/05/2024 | Date of Next<br>Review | Name<br>MICHAEL<br>VERBRUGGE | Supv. Tax No. |

33

Exhibit D

**Tracking# 91191528**

| | OTHER ATTACHMENTS | Crime/Condition MISCELLANEOUS PENAL LAW | Command 046-46TH PRECINCT Date of This Report 03/01/2024 |
|---|---|---|---|

| Date Reported 02/28/2024 | Complaint No. 2024-046-02119 | Date Case Assigned 02/28/2024 | Case No. 2024 - 770 | Unit Reporting SQUAD | | Follow-Up No. 23 |
|---|---|---|---|---|---|---|

| Topic/Subject (OTHER ATTACHMENTS) SIGNED WANTED FLYER/INFORMATION NEEDED FLYER | Activity Date 03/01/2024 | Activity Time 11:47 |
|---|---|---|

| Person Interviewed Last Name, First M.I. | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Position/Relationship | Sex | Race | Date of Birth | Age |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

**Details**

**Summary of Investigation:**
1. On March 1, 2024, at approximately 1147 hours, I have attached the Wanted Flyer/Information Needed Flyer signed by P.O. Reynoso, Shield# 23028, Tax#       048 Pct, on March 1, 2024, at approximately 0028 hours with Det. Madden to this document.

2. For your information.

| Perpetrator's Last Name, First M.I. MEJIA, BRIAN | | | | Wanted/Arrested WANTED | | | |
|---|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | | |
| Address 452 EAST 187 STREET BRONX NY 10458 | | | Apt No. 4C | Res. Pct. 048 | NYSID No. | | |
| Position/Relationship NO RELATIONSHIP | Sex MALE | Race WHITE HISPANIC | Date of Birth | Age | Height | Weight | |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA | |

**Description**
Eye Color:BROWN Hair Color:BLACK Hair Length:NORMAL Hairstyle:CURLY/WAVY Complexion:CLEAR Skin Tone:MEDIUM

| Accent No | Weapon USED/DISPLAYED | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) Gun:HANDGUN Type:PISTOL, SEMIAUTOMATIC Caliber:.380 CAL | Discharged Yes |
|---|---|---|---|

3/26/24, 9:23 PM                              Complaint# 2024-046-002119

| Gang Affiliation<br>Yes | Gang Name<br>UNKNOWN | | Gang Identifier | |
|---|---|---|---|---|
| M.O. | Transit M.O. | | | |
| Action Toward Victim | Special Characteristics | | New Burglary/Grand Larceny Specific M.O. | |
| Mask: | | Gloves: | | |
| Clothing Description<br>Head Gear:UNK Foot Gear:UNK Outer Wear:UNK Other Clothing/Accessories:UNK | | | | |
| Scars, Marks | | | | |
| Impersonation of<br>UNKNOWN | | If other | | |
| Frequents Areas in the Confines of the Precinct(s) | | | | |

| Activity Address Location<br>OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of<br>and | | Premise Type | |

| ATTACHMENT | | |
|---|---|---|
| No | Attachment | Description |
| 1 | PDF<br>1709314329895_240301123056-5441347.pdf | |

| Reporting Officer: | Rank<br>DT1 | Name<br>ANDREW MACELHINNEY | | | Tax Reg. No. | Command<br>269-46 DET SQUAD |
|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing<br>- | Date Reviewed:<br>03/03/2024 | Date of Next Review | | Name<br>ROBERT FOLEY | Supv. Tax No. |

36

Exhibit E

3/26/24, 9:23 PM                                    Complaint# 2024-046-002119

| UNUSUAL OCCURRENCE REPORT-SUPPLEMENT | | Crime/Condition MISCELLANEOUS PENAL LAW | Command 046-46TH PRECINCT Date of This Report 03/25/2024 |
|---|---|---|---|

| Date Reported 02/28/2024 | Complaint No. 2024-046-02119 | Date Case Assigned 02/28/2024 | Case No. 2024 - 770 | Unit Reporting SQUAD | | Follow-Up No. 49 |
|---|---|---|---|---|---|---|

| Topic/Subject (UNUSUAL OCCURRENCE REPORT-SUPPLEMENT) UNUSUAL OCCURRENCE REPORT SUPPLEMENT | | Activity Date 03/25/2024 | Activity Time 11:00 |
|---|---|---|---|

### Offense Information

| Date of Offense 02/28/2024 | | Time of Offense 09:07 | |
|---|---|---|---|
| Building # 2333 | Address CRESTON AVENUE | Apt# 3B | Borough/City BRONX |
| Precinct 046 | Housing Dev. Name | PSA Number | Premise Type |
| School Number | School Name | Type of School | |

### Details

**Summary of Investigation:**
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX1.On February 28, 2024 at approximately 1100 Hours Po KUHL Tax# ▮ Assigned to 46 Sec C, Responded to a radio run (ICAD D24022806574, D24022806592, D24022806650, & D24022806916) for a 39H1, 10S1 shots fired inside 2333 Creston Avenue. Upon arrival R/O was met by CV?s who stated they were on there was out when they unknown person shot there door multiple times. ((2) .380 caliber casings and 1 fired bullet recovered on scene) R/O did check and view CV?s Doorbell ring camera and gave a description of Deft who was a male wearing all back bubble vest with black hoodie and black pants with black and white sneakers. 46 Det Squad did respond on scene and collected video of incident which shows Deft fleeing SB on Creston Avenue toward East 183 Street to unknown location.XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2.All Video below collected between 02/28/24 and 02/29/24
Video collected from 2333 Creston (incident location) Video collected from Det Burgos rom ▮
▮ Video collected is accurate to date and time, results are as follows:-Camera 01,03, 04: At approximately 0827 hours video shows suspect exiting 2333 Creson Avenue traveling N/B on Creston Avenue on foot. Suspect is wearing black hoodie, black vest, black pants, black hat and black sneakers. Video shows suspect returning to 2333 Creston Avenue at approximately 0829 hours, opening the front door to the building what appears to be a key then walking up the stairs wearing the same clothing described. At approximately 0907 hours video shows suspect exiting 2333 Creston Avenue and fleeing of foot S/B on Creston Avenue. After extensive video canvas US did obtain a photo for a wanted flyer and did have Det Madden assist in a conferral with Po Reynoso Tax# ▮ 48 Patrol on 03,01,2024 at approximately 1147 Hours.

3. Video collected from US and other Detectives along the route:
-131 East 183 Street that shows at 908:56 hours Deft walking SB on Creston Avenue to EB on East 183 Street toward Grand concourse.
- 2285 Grand Concourse shows at approximately 0909:27 Deft walking to the NW CO of East 183 Street and Grand Concourse and back toward Creston And back toward Grand Concourse when he finally crosses over EB @ 0913:23 Hours and continuing EB on Grand Concourse toward Ryer Avenue on East 183 Street.
-Argus Video shows Deft
Argus# 3.2253 shows Deft exiting and exiting building from approximately 0827- 0829
A# 3.1204#1 shows Deft going EB on 183 @ Valentine Ave at approximately 0908-0915
A# 3.22101 #1&2 shows the EB side of E 183 street and GC
A# 3.22111 #1&2 shows Deft walking EB on East 183 ST from approx 0914-0917
A# 3.22178 shows Tiebout Ave and East 183 shows Deft walking into Ford Houses at 0914-0920
A# 3.22120 #1&2 shows Deft walking NB on Washington Ave from East 183 Street. Toward East 184 Street
-385 Ford shows Deft walking down the stairs from 183 Street and Tiebout avenue into Ford Houses @0917 Hours continuing through the court yard and out onto Webster Avenue where he is seen continuing EB across Webster Avenue continuing across Park Avenue continuing toward Washington Avenue.
- 490 East 184 Street Video is approximately 2 Minutes fast and shows Deft at approximately 0919:27 Deft is seen walking from NW CO of East 184 Street and Bassford to the SW CO heading NB on Bassford at Approximately 0922:38 Hours Deft is seen back tracking across the street from Bassford Avenue onto East 184 Street.
- Video from 471 East 184 Street shows Deft walk up into the location two the second floor apartment which management told US that was a vacant apartment.

4. Conferral with 48 PDU Det O?Donnell in regards to previous NFS 61#2024-046-1807.

3/26/24, 9:23 PM            Complaint# 2024-046-002119

-Conferral with 40 PDU Detective Cordero in regards to NFS 61# 2024-040-2713
- Conferral with Criminal Enterprise INV Det Tepperman

5. ECT Run# 24/1152: DET Jabber from ECT responds to a reckless endangerment I/O 2333 Creston Avenue on the Third Floor in the confines of the 46 PCT. Po Kuhl did safe guard the scene until ECT Arrived. One Fired bullet (1) WIN .380 and (1) WIN.380 on the floor I/F/O APT 3B. No Ballistics recovered.

6. Central Investigation DIV Case# 2024-781, Gun Violence Supp Case # 2024-10,Warrant section 2024-100

7. Motive is Retaliation from 48 Complaint #2024-048-1807, NGS of DEFT

8. Deft Taken into Federal Custody on 03/19/2024 at approximately 0555 Hours inside of 1520 Sedgwick Avenue APT 8F By Criminal Enterprise INV and Bronx Warrants.
- Arrest # B24613879-J

9. Unusual Occurrence Supplement READ by Lt. Foley.

| If Business, Business Name | Person's Last Name, First M.I. MEJIA, BRIAN | | Person/Business Role ARRESTED | Housing Res. | Probation | Parole |
|---|---|---|---|---|---|---|

| Nickname/Alias/Middle Name |
|---|

| Address 452 EAST 187 STREET BRONX NY 10458 | | | | Apt No. 4C | Res. Pct. 048 | NYSID No. |
|---|---|---|---|---|---|---|

| Arrest # | Date | Top Charge | | | | |
|---|---|---|---|---|---|---|
| B15618813 | 03/30/2015 | PL 155.30 04 | | | | |
| B15628225 | 05/13/2015 | PL 160.10 01 | | | | |
| B15633811 | 06/08/2015 | PL 160.05 | | | | |
| B15636423 | 06/30/2015 | PL 160.10 01 | | | | |
| B15645635 | 08/01/2015 | PL 120.05 02 | | | | |
| B16633399 | 06/10/2016 | PL 155.30 04 | | | | |
| B16645942 | 08/13/2016 | PL 190.23 | | | | |
| B16661282 | 10/31/2016 | PL 240.10 | | | | |
| B17604583 | 01/25/2017 | PL 120.06 | | | | |
| B17661868 | 12/06/2017 | PL 225.30 02 | | | | |
| B17663602 | 12/17/2017 | PL 170.15 01 | | | | |
| B18615136 | 03/30/2018 | PL 220.16 01 | | | | |
| B18623954 | 05/23/2018 | PL 215.40 02 | | | | |
| B18646129 | 10/10/2018 | PL 265.03 01B | | | | |
| B19605088 | 02/02/2019 | PL 221.10 | | | | |
| B19612484 | 03/21/2019 | PL 265.03 01B | | | | |
| B20604403 | 02/05/2020 | PL 220.03 | | | | |
| B21606126 | 02/28/2021 | PL 265.03 01B | | | | |
| Q21609344 | 04/07/2021 | FOA900.00 49 | | | | |

| Position/Relationship NO RELATIONSHIP | Sex MALE | Race WHITE HISPANIC | Date of Birth | Age | Height | Weight |
|---|---|---|---|---|---|---|

| Age From | Age To | Injured/Deceased | Type of Injury | | Removed to Hospital | Hospital Name |
|---|---|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |
|---|---|---|---|---|---|---|

| Description Eye Color:BROWN Hair Color:BLACK Hair Length:NORMAL Hairstyle:CURLY/WAVY Complexion:CLEAR Skin Tone:MEDIUM |
|---|

| Accent No | Weapon USED/DISPLAYED | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) Gun:HANDGUN Type:PISTOL, SEMIAUTOMATIC Caliber:.380 CAL | | | | Discharged Yes |
|---|---|---|---|---|---|---|

| Gang Affiliation Yes | | Gang Name UNKNOWN | | Gang Identifier | | |
|---|---|---|---|---|---|---|

| Mask YES | Mask Description | | Gloves NO | Gloves Description | | |
|---|---|---|---|---|---|---|

| Clothing Description Head Gear:UNK Foot Gear:UNK Outer Wear:UNK Other Clothing/Accessories:UNK |
|---|

| Scars, Marks |
|---|

https://ecms.nypd.org/ecms/login.action#   68/71

3/26/24, 9:23 PM                                    Complaint# 2024-046-002119

| Impersonation of | | If other |
|---|---|---|

| Statements/Criminal History |
|---|

| **VEHICLE** |
|---|

| **Recovered Weapons** | | | | | |
|---|---|---|---|---|---|
| **Weapon Type**<br>GUN | **Weapon**<br>USED/DISPLAYED | **Weapon Description** | | | **NYSID** |
| **Gun**<br>HANDGUN | **Discharged**<br>YES | **Make** | **Color** | **Caliber** | **Type** |
| **Type of Location Seized On** | | **If Other Location, Specify** | | **Precinct Voucher #** | |

| **Notifications** | | | | | |
|---|---|---|---|---|---|
| **Unit/Agency** | **Tax ID** | **Name** | | **Rank** | **Cmd** |
| N.Y. POLICE DEPT | | STANLEY DEGOICOECHEA | | DT3 | 201-DETECTIVE BUREAU |
| N.Y. POLICE DEPT | | ROBERT FOLEY | | LT | 269-DET SQD. BX-046 |
| N.Y. POLICE DEPT | | ROBERT TROIANI | | SGT | 269-DET SQD. BX-046 |
| N.Y. POLICE DEPT | | TANCREDO CONTRERAS | | CPT | 201-DETECTIVE BUREAU |

| **ATTACHMENTS** |
|---|

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>BRENDAN MCMORROW | | **Tax Reg. No.** | **Command**<br>269-46 DET SQUAD |
|---|---|---|---|---|---|
| **Reviewing Supervisor:** | **Manner of Closing**<br>- | **Date Reviewed:**<br>03/25/2024 | **Date of Next Review** | **Name**<br>ROBERT FOLEY | **Supv. Tax No.** |

Exhibit F

| Tracking# 91196761 | | | | | |
|---|---|---|---|---|---|
| **Other Action** | | | | **Crime/Condition**<br>ASSAULT-FELONIOUS | **Command**<br>040-40TH PRECINCT<br>**Date of This Report**<br>03/01/2024 |
| **Date Reported**<br>02/29/2024 | **Complaint No.**<br>2024-040-02713 | **Date Assigned**<br>02/29/2024 | **Case No.**<br>2024 - 559 | **Unit Reporting**<br>FIO | **Follow-Up No.**<br>3 |

| **Topic/Subject**<br>(Other Action) CONFERRAL 48FIT | **Activity Date**<br>02/29/2024 | **Activity Time**<br>20:40 |
|---|---|---|

| **Details** |
|---|

**Summary of Investigation:**
1. On February 29, 2024, at approximately 2040 hours, 40FIT PO Silva conferred with Det Cabrera of 48FIT in regard to this investigation. There is a high probability that this incident is connected with a non-fatal shooting of a crewmember Brian Mejia DOB: ▮▮▮▮ under complaint# 2024-48-1807.

2. Submitted for your information.

| **ATTACHMENT** | | |
|---|---|---|
| **No** | **Attachment** | **Description** |

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>SANJAY GIDARISINGH | | **Tax Reg. No.** | | **Command**<br>318-INTEL-CRIMINAL INTEL<br>SECTION |
|---|---|---|---|---|---|---|
| **Reviewing Supervisor:** | **Manner of Closing**<br>- | **Date Reviewed:**<br>03/08/2024 | **Date of Next Review** | **Name**<br>DARREN EARL | | **Supv. Tax No.** |
| **Endorser:** | **Rank**<br>SGT | **Name**<br>DARREN EARL | | **Tax Reg. No.** | **Command**<br>318 | **Status**<br>Approved |
| | **Endorsement Date**<br>03/08/2024 | **Comments** | | | | |

Exhibit G

| Tracking# 91199481 | | | | | |
|---|---|---|---|---|---|
| **Other Action** | | | | **Crime/Condition**<br>ASSAULT-FELONIOUS | **Command**<br>040-40TH PRECINCT<br>**Date of This Report**<br>03/01/2024 |
| **Date Reported**<br>02/29/2024 | **Complaint No.**<br>2024-040-02713 | **Date Assigned**<br>02/29/2024 | **Case No.**<br>2024 - 559 | **Unit Reporting**<br>FIO | **Follow-Up No.**<br>16 |

| **Topic/Subject**<br>(Other Action) CONFERRAL GVSD | **Activity Date**<br>03/01/2024 | **Activity Time**<br>10:30 |
|---|---|---|

| **Details** |
|---|

**Summary of Investigation:**

1. On March 1, 2024, at approximately 1030 hours the u/s conferred with Det Paris of GVSD. The u/s was provided that he is currently the SAFETNET holder for the victim [ ] [ ]

2. Furthermore, Det Paris and the u/s discussed details to the ongoing investigation of recent shootings in the confines of the 40, 48, and 46, Det Paris showed the u/s a still image of a suspect and the u/s was able to identify the said perpetrator as Brian Mejia DOB: [ ] NYSID# [ ] The perpetrator is wearing the same Moncler black vest and Asics black sneakers with a matching all black outfit. The u/s provided all details of the POI to Det. Paris. Det Paris states he will share the information with 46PDU.

3. Submitted for your information.

| **ATTACHMENT** | | |
|---|---|---|
| **No** | **Attachment** | **Description** |

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>SANJAY GIDARISINGH | | **Tax Reg. No.** | | **Command**<br>318-INTEL-CRIMINAL INTEL SECTION |
|---|---|---|---|---|---|---|
| **Reviewing Supervisor:** | **Manner of Closing**<br>- | **Date Reviewed:**<br>03/08/2024 | **Date of Next Review** | **Name**<br>DARREN EARL | | **Supv. Tax No.** |
| **Endorser:** | **Rank**<br>SGT | **Name**<br>DARREN EARL | | **Tax Reg. No.**<br>[ ] | **Command**<br>318 | **Status**<br>Approved |
| | **Endorsement Date**<br>03/08/2024 | **Comments** | | | | |

Exhibit H





Complaint # 2024-046-2119          Complaint #2024-040-2713

#1 White line on hood
#2 Black vest
#3 Logo on vest
#4 zipper on hoody
#5 sneakers